

5-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2714 | **DATE** | 5/3/2001 |
| **CASE TITLE** | | David E. Corder vs. William A. Halter | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** The Court grants the plaintiff's motion for summary judgment [doc. # 13-1] remanding the case for further proceedings consistent with this opinion, and denies the government's cross-motion [doc. # 11-1]. The Clerk of the Court is therefore directed to enter a final judgment pursuant to 42 U.S.C. § 405 (g) (Sentence 4) and Fed. R. Civ. P. 58 and to terminate this case.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | **number of notices** | **Document Number** |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | 5/4/01 | |
| | Notified counsel by telephone. | | | **date docketed** | |
| | Docketing to mail notices. | | | C S | 14 |
| | Mail AO 450 form. | | | **docketing deputy initials** | |
| | Copy to judge/magistrate judge. | | | 5/3/2001 | |
| | | | | **date mailed notice** | |
| JJK | courtroom deputy's initials | 01 MAY -3 PM 3: 19 | | JJK | |
| | | Date/time received in central Clerk's Office | | **mailing deputy initials** | |

DOCKETED

MAY 0 4 2001

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| David E. Corder, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 00 C 2714 |
| | ) | |
| vs. | ) | Magistrate Judge Schenkier |
| | ) | |
| | ) | |
| William A. Halter, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| | ) | |
| Defendant.[1] | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, David Corder ("Mr. Corder"), seeks judicial review pursuant to the Social Security Act, 42 U.S.C. §405(g), of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). Mr. Corder seeks summary judgment reversing the Commissioner's decision denying his claim for SSI or, in the alternative, remanding the case to the Commissioner for further proceedings (doc. # 13-1). The Commissioner has filed a cross-motion for summary judgment in his favor (doc. # 11-1). For the reasons set forth below, the Court denies the Commissioner's motion for summary judgment, and grants Mr. Corder's alternative motion for remand.[2]

---

[1]Mr. Halter, the acting Commissioner of Social Security, is substituted as defendant in place of Kenneth S. Apfel, the former Commissioner, pursuant to Fed. R. Civ. P. 25(d)(1).

[2]By the parties' consent, on September 14, 2000, this case was reassigned to this Court, pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule 73.1(b), to conduct any and all proceedings and to enter final judgment (doc. # 6).

# I.

## A.    Procedural History

On June 1, 1993, Mr. Corder filed concurrent applications for SSI and Disability Insurance Benefits ("DIB"), alleging that he became disabled on September 15, 1986 (R. 37) due to back problems, alcoholism and asthma (R. 78). His applications were denied on September 15, 1993 (R. 58-65), and those denials were affirmed upon reconsideration on April 7, 1994 (R. 69 – 74). Mr. Corder filed his Request for Hearing on April 18, 1994 (R. 75) and, on March 9, 1995, he appeared with counsel and testified at an administrative hearing before an Administrative Law Judge ("ALJ") (R. 28-32, 398-431). The ALJ issued a decision on November 13, 1995, finding that Mr. Corder was not disabled (R. 213-225). Mr. Corder then filed a Request for Review, and on April 2, 1997 the Appeals Council vacated the decision and remanded the case to the ALJ for further proceedings (R. 232-233). On April 17, 1998, Mr. Corder amended the onset date of his alleged disability to October 1, 1992 (R. 14). Noting that the date of his last insured status was September 30, 1989, Mr. Corder informed the Agency that he had abandoned his DIB claim and would pursue only his SSI claim (R. 374).

On June 11, 1998, Mr. Corder appeared with counsel and testified at a hearing before the same ALJ who had issued the 1995 decision (R. 444-458). On November 19, 1998 the ALJ issued a second decision, again finding Mr. Corder not disabled (R. 10-27). Mr. Corder filed a request for review of the ALJ's decision on December 17, 1998 and on March 2, 2000 the Appeals Council denied review of the ALJ's decision (R. 7-9). At that point, the ALJ's decision became the final decision of the Commissioner and subject to judicial review. *See Luna v. Shalala*, 22 F. 3d 687, 689

(7th Cir. 1994). Mr. Corder filed his complaint in federal court seeking reversal or remand of the Commissioner's decision on May 4, 2000.

**B.   Factual Background**

Mr. Corder was born on April 10, 1958 (R. 37) and is 43 years old. His formal education ended after he completed his first year of high school (R. 402). Prior to 1984, Mr. Corder was consistently employed as a factory worker and serviceman (R. 86). All of Mr. Corder's past relevant work has been unskilled and heavy, involving frequent to constant standing, walking and bending (R. 86-91). His last job ended on or about September 15, 1986 (R. 86).

*1.   Mr. Corder's low back, rib and cervical pain.*

As early as November 21, 1984, Mr. Corder complained of low back pain. At that time, Paul Odland, M.D., noted no spasm and found a full range of motion in Mr. Corder's back (R. 209). On January 3, 1987, Mr. Corder reported to Grant Hospital with complaints of low back pain, and Dr. Odland noted "marked paravertebal muscle spasm at L4-L5 left greater than right," with straight leg raising to 65 degrees on the left side and 75 degrees on the right (R. 210). Mr. Corder's deep tendon reflexes were symmetric, and his sensation and gait were within normal limits (R. 210).

On April 20, 1988, Mr. Corder was diagnosed as suffering from lower back syndrome, because he continued to have symptoms while lifting or standing for long periods (R. 208). On April 13, 1989, Mr. Corder reported low back pain. His physical examination revealed forward flexion to within 10 inches of the floor with pain (R. 208). On August 9, 1989, Dr. Odland noted episodic flares of Mr. Corder's low back pain (R. 207). On April 16, 1993, Mr. Corder reported to Dr. Odland that he had "pulled his back out" resulting in sacroiliac pain (R. 205). On June 15, 1993, Dr.

Odland's physical examination revealed a "tender sacroiliac, right greater than left, straight leg raising at 30 degrees" (R. 204). On July 27, 1993, Dr. Odland indicated his impression of Mr. Corder's complaints as "spinal disorder with chronicity; cannot work with lifting" and diagnosed Mr. Corder with "multiple episodes of lumbosacral sprain" (R. 119). Additionally, Dr. Odland noted that Mr. Corder's x-rays showed "some degenerative changes" (R. 119). Dr. Odland reported that Mr. Corder would not be permitted to lift, carry or bend (R. 120).

On August 16, 1993, Julius Villaflor, M.D., completed a Residual Physical Functional Capacity Assessment form (R. 121-129).[3] Dr. Villaflor noted that Mr. Corder had complained of bronchial asthma, low back pain and alcohol dependence, but noted no severe impairment (R. 128).

An x-ray report dated June 13, 1995, from Illinois Masonic Medical Center stated that Mr. Corder had a history of "pain in [the] lower back for some time" (R. 334). The x-ray revealed "hypertrophic degenerative changes . . . at multiple levels. There is degenerative disk space narrowing at L4-L5 with sclerosis of the adjacent vertebral body end-plates . . ." (R. 334). The x-ray further noted no evidence of fracture or malalignment (R. 334). On July 8, 1998, Dr. Irwin Feinberg conducted a consultative orthopaedic examination at the ALJ's request (R. 380-385). Dr. Feinberg reported that Mr. Corder's chief complaints were asthma, low back pain and malunion of a left rib fracture, which caused pain when Mr. Corder pressed on it (R. 380). On examination, Mr. Corder had a decreased cervical lordosis, with decreased range of motion of the neck and severe left trapezius tenderness (R. 381). The range of motion of all upper extremity joints was normal, and there was no atrophy in the musculature (R. 382). Mr. Corder stood with the left shoulder higher

---

[3]"Residual functional capacity is a measure of 'how much an adult can do despite his impairment.'" *Zurawski v. Halter*, ___ F.3d ___, No. 00-2303, 2001 WL 355642, at n.5 (7th Cir. 2001).

than the right, and there was an increased lumbar lordosis and a left dorsal scoliosis (R. 382). Mr. Corder's neurological examination was normal (R. 382). Dr. Feinberg identified three problems: 1) symptomatic degenerative arthritis of the lumbosacral spine; 2) bronchial asthma; and 3) degenerative disk disease of the cervical spine (R. 382). In his "Medical Assessment" form, Dr. Feinberg restricted Mr. Corder's ability to lift and/or carry to 10-15 pounds frequently and 15-20 pounds occasionally due to "pain left low back" (R. 384). Mr. Corder's abilities to stand, walk, and sit were unaffected by his impairment (R. 384). Dr. Feinberg also reported that Mr. Corder was limited in his ability to push/pull and, though he reported that Mr. Corder could stoop and crouch frequently, he could only occasionally climb, balance, kneel and crawl (R. 385).

### 2. Mr. Corder's mental impairments.

On July 16, 1993, Mr. Corder underwent a psychiatric evaluation by SSA Consultative Evaluator, Robert Beebe, M.D. (R. 112-115). Mr. Corder told Dr. Beebe that he was "disabled" mainly because of his back problems, but also because of shaking in the morning due to alcohol (R. 112). Dr. Beebe reported that, on examination, Mr. Corder showed no tension or abnormalities of behavior, there was no dysphoria, and his affect was socially appropriate (R. 113). Further, Mr. Corder's speech was appropriate; he was not delusional; and his thought processes were intact (R. 113). Lastly, Dr. Beebe noted that Mr. Corder was oriented in time, place and person, and his recent memory and remote memory were grossly intact (R. 113). Mr. Corder told Dr. Beebe that he lived in an apartment with his mother, wife and three children, and he sometimes helped with the cleaning, cooking, laundry and grocery shopping; he also watched television and read the newspaper (R. 114). Mr. Corder walked his children to school, nine blocks away, and then walked to the liquor store (R.

114). He drank at home and sat on the porch (R. 114). As a result of the examination, Dr. Beebe estimated Mr. Corder's intelligence to be in the average range (R. 113).

On September 1, 1993, Stephen Vincent, Ph.D., reviewed Mr. Corder's file and completed a Mental Residual Functional Capacity Assessment form (R. 130-133). Dr. Vincent noted that Mr. Corder was dependent on alcohol (R. 133). Additionally, Dr. Vincent noted that Mr. Corder lived with his wife, children and mother, and he was able to do domestic chores, go out alone, and use public transportation (R. 133). Mr. Corder's affect was appropriate, and his memory and thought processes were intact (R. 133). His basic cognitive thinking was adequate, and his intelligence was estimated at the average range (R. 133). Dr. Vincent concluded that Mr. Corder retained "the mental capacity to do simple routine tasks" (R. 133).

On December 15, 1993, Michael Diamond, Ph.D., conducted a consultative psychological examination of Mr. Corder (R. 159-175). Dr. Diamond reported that Mr. Corder was oriented in all spheres, although his "mood was somewhat depressed" (R. 159). Dr. Diamond considered the results of Mr. Corder's evaluation to be "a valid and reliable indicator of [Mr. Corder's] current level of psychological functioning" (R. 159). Dr. Diamond's testing indicated that Mr. Corder had a verbal IQ score of 71, a Performance IQ score of 76, and a Full Scale IQ score of 72, placing him in the lower end of the borderline range of intellectual functioning (R. 160). His reading and spelling scores were below the third grade level, and his arithmetic skills were the equivalent of a fifth grade level (R. 161). Dr. Diamond further indicated that Mr. Corder would not understand vocational training materials of a technical or semi-technical nature, but that Mr. Corder did understand most inventory items with some assistance from the examiner (R. 161).

Dr. Diamond concluded that Mr. Corder's intellectual capacity is quite low (R. 162). Further, Dr. Diamond stated that while Mr. Corder is "not mentally retarded," he exhibits severe verbal functioning limitations (R. 162). In an attached Psychiatric Review Technique form, Dr. Diamond concluded that Mr. Corder's impairment met listing 12.09 (substance abuse disorders) (R. 164). Mr. Corder had a moderate restriction of activities of daily living and moderate difficulties in maintaining social functioning (R. 170). He had frequent deficiencies of concentration, persistence, or pace in addition to repeated episodes of deterioration or decomposition in work or work-like settings (R. 170). Lastly, Dr. Diamond indicated that Mr. Corder had marked limitations in five of twelve listed mental limitations, moderate limitations in five of those listed, and slight limitations in the remaining two (R. 173-174).

On May 21, 1997, Mary Gardner, M.S. Ed., Psy. D., evaluated and tested Mr. Corder (R. 248). Mr. Corder told Dr. Gardner that he had attended special education classes in grammar school, and he failed the fourth grade (R. 248). Regarding daily activities, Mr. Corder reported that other than daily Alcoholic Anonymous meetings, he had no other structured activities (R. 249). Mr. Corder denied any psychiatric problems, but reported a long history of alcohol abuse, beginning at approximately age 15; but, he said that he had not consumed alcohol for the past two years and one month (R. 249). Dr. Gardner noted that Mr. Corder appeared much older than his stated age, his complexion was pasty, and he appeared puffy (R. 249). Mr. Corder's appearance was somewhat unkempt and he spoke in vague and imprecise terms (R. 249). However, Dr. Gardner believes he "gave the best effort he appeared to be capable of, and [the] test results are deemed to be a valid estimate of his current level of functioning" (R. 250).

Tests indicated that Mr. Corder had Verbal and Performance IQ scores of 74, with a Full Scale IQ score of 73 (R. 250). His reading level was a fourth grade equivalent and his arithmetic skills scored at the fifth grade level (R. 250). Mr. Corder's Full Scale IQ scores placed him in the Borderline Range of Intelligence, as did his Verbal and Performance scores (R. 250). Mr. Corder's weakest score was in a subtest that measured his general fund of information and school-based facts (R. 250). Here, he received a score in the mentally retarded range (R. 250).

Dr. Garder reported that Mr. Corder's mood was euthymic,[4] and his range of affect was quite constricted (R. 251). There was no evidence of grossly disorganized or psychotic functioning (R. 251). However, Mr. Corder spoke with an imprecise vocabulary, did not initiate much conversation, and rarely smiled (R. 251). During the evaluation, Dr. Gardner noted that Mr. Corder was having significant memory problems, had difficulty with cognitive sequencing, and his visual sequencing was quite poor (R. 251).

In the Psychiatric Review Technique form, Dr. Gardner indicated that Mr. Corder's mental impairment equaled listing 12.05 (mental retardation and autism) (R. 253), that he exhibited symptoms of memory impairment and perceptual or thinking disturbances (R. 255), that a listing 12.09 (substance addiction disorder) was absent (R. 259), and that he frequently experiences deficiencies of concentration, persistence or pace as well as reported episodes of deterioration or decompensation in work or work-like settings (R. 260).

---

[4]The prefix "eu" signifies good or "well" (as opposed to "dis" which means "ill"). "Thymic" deals with the "thymus" which is a ductless gland with undetermined function in the upper throat, but is an old medical term that signifies mood. Thus, "euthymic" means the mood is good or a person feels good. *Webster's New Universal Unabridged Dictionary* at 628, 1906 (Release 2d ed.)

In the Mental Residual Functional Capacity Assessment, Dr. Gardner indicated that Mr. Corder is markedly limited in the following categories: his ability to remember locations and work like procedures, his ability to understand and remember detailed instructions, his ability to carry out detailed instructions, his ability to maintain attention and concentration for extended periods, his ability to complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and his ability to set realistic goals or make plans independently of others (R. 262-263).

3.    *Mr. Corder's Asthma and Alcohol Dependence.*

On October 1, 1992, Mr. Corder was treated at Grant Hospital for acute bronchitis with bronchospasms (R. 101). Mr. Corder complained of shortness of breath, wheezing, and non-productive coughing (R. 102). On July 27, 1993, Dr. Odland reported that Mr. Corder suffered from bronchitis with asthma (R. 116). On July 8, 1998, Dr. Feinberg noted rhonchi in both inferior lobes, but no rales or wheezes (R. 381). The ALJ found that the medical evidence confirms Mr. Corder's testimony that he has been sober since April 1, 1995 (R. 15).

**D.    The ALJ's Decision**

The ALJ's written decision followed the sequential evaluation assessment outlined in 20 C.F.R. §§ 404.1520 and 416.920. *The first step* of the sequential evaluation involves determining whether the claimant has engaged in substantial gainful activity since his alleged disability onset date – here, October 1, 1992. The ALJ found that Mr. Corder had not engaged in disqualifying substantial gainful activity since October 1, 1992 (R. 14).

*The second step* of the sequential evaluation involves determining whether the claimant has a "severe" impairment, or combination of impairments, which significantly limits his physical or

mental ability to do basic work activities. The ALJ found that Mr. Corder's residual functional capacity limitations meet this definition of "severe" (R. 14).

*The third step* of the sequential evaluation required the ALJ to determine whether Mr. Corder's impairments meet or equal the requirements for an impairment contained in the regulatory listing. The ALJ found that none of Mr. Corder's impairments, singly or taken together, meet the requirements or equal the level of severity contemplated for any impairment in the regulatory listing at any time since his alleged disability onset date (R. 14-15). In making this determination, the ALJ found that Mr. Corder has the residual functional capacity to perform work, because his impairments preclude only the following activities: lifting more than 20 pounds occasionally or 10 pounds frequently; kneeling, climbing, balancing or crawling more than occasionally; and understanding, remembering, and/or carrying out detailed and complex work tasks (R. 15). In reaching this determination, the ALJ concluded that the medical evidence did not support the existence of greater limitations (R. 15). Specifically, the ALJ found that although Mr. Corder initially alleged liver problems, Mr. Corder did not mention this condition at his most recent hearing (R. 15). Additionally, Mr. Corder specified alcoholism as one of his disabling impairments, but the ALJ noted that Mr. Corder had been sober since April 1, 1995 (R. 15).

Further, although the record confirms the diagnoses of asthma, disc disease and arthritis, the ALJ determined that the findings do not suggest significant pathology (R. 15). Regarding Mr. Corder's asthma, the ALJ points to a July 1993 Respiratory Report submitted by Dr. Odland which indicates that, despite bronchial asthma induced by cigarette smoking, Mr. Corder's breath sounds were normal, he was having no severe attacks, and pulmonary function studies were not indicated (R. 15). Additionally, the ALJ cited Dr. Feinberg's July 1998 report in which Mr. Corder's lungs

were clear to auscultation and percussion and, while rhonchi were detected, there were no rales or wheezing (R. 16). Lastly, the ALJ noted that while Mr. Corder was found to have acute bronchitis and bronchospasm in October 1992, the condition was well controlled with medication (R. 16).

The ALJ next reviewed Mr. Corder's back pain and acknowledged that Mr. Corder has been complaining of back pain for at least 10 years and that x-rays indicate degenerative changes at multiple levels with disc space narrowing at L4-L5 and sclerosis of the adjacent vertebral body endplates (R. 16). The ALJ considered Dr. Feinberg's July 1998 examination in which there was a noticeable decrease in the cervical lordosis, and limitation of motion in the neck in addition to severe left trapezius tenderness; however, there was negative straight leg raising bilaterally and only a slight limitation of motion in the lumbar spine (R. 16). The ALJ noted that Mr. Corder's motor power was good and sensation was intact. The ALJ found that Mr. Corder was diagnosed with degenerative arthritis of the lumbar spine and degenerative disc disease of the cervical spine (R. 16).

Regarding Mr. Corder's mental impairments, the ALJ found that these included alcohol dependence and borderline intellectual functioning (R. 16). The ALJ also noted that Mr. Corder's IQ scores were low, but his mental status evaluations were consistently normal (R. 16). Further, the ALJ noted that Mr. Corder appeared fully oriented and adequately cooperative at the hearing, and there was no medical evidence indicating a thought disorder, depression or significant personality pathology (R. 16). The ALJ further stated that none of the progress reports from any of the therapists or physicians refer to any cognitive deficits (R. 16-17).

The ALJ found that Mr. Corder's described daily activities were not limited to the extent one would expect, given his complaints of disabling symptoms and limitations (R. 17). The ALJ found that Mr. Corder was never more than moderately limited in performing daily living activities (R. 17).

11

The ALJ concluded that although Mr. Corder has received treatment for the allegedly disabling impairments, that treatment has been routine and/or conservative in nature (R. 17).

Regarding Mr. Corder's poor cognitive ability, the ALJ noted that the two assessments were made by examiners at the request of Mr. Corder's attorney for the purposes of generating evidence for the case, and not in an attempt to seek treatment for symptoms (R. 17). The ALJ found that the two assessments focus on Mr. Corder's borderline IQ, but that his low IQ had no affect on Mr. Corder's daily life or social relationships (R. 17). The ALJ also noted that none of the other medical evidence refers to Mr. Corder's poor cognitive ability except during the time that he was a heavy drinker (R. 17). The ALJ noted that Mr. Corder has been able to hold jobs in the past (R. 17), and that his ability to complete IQ tests indicates that he has the ability to understand and remember and carry out at least simple instructions (R. 17).

The ALJ further found that the mental residual functional capacity conclusions reached by the State Disability Determination Services supported a finding of "not disabled" (R. 18). The ALJ concurred with the state's assessment that Mr. Corder has retained the capacity to perform simple routine tasks (R. 18). In reaching his decision, the ALJ considered Mr. Corder's demeanor while testifying during the hearing and determined that there were no signs of grave limitations (R. 18). The ALJ emphasized that this observation is only one among many that he relied upon in reaching his conclusion that Mr. Corder's impairments did not meet or equal any listed disabilities (R. 18), but he did not articulate any other basis for his decision.

*The fourth step* of the sequential evaluation required the ALJ to determine whether Mr. Corder was able to perform his past relevant work. The found that Mr. Corder could not perform his past relevant work and that his acquired skills from that work were not transferable (R. 20).

However, at *the fifth step*, the ALJ found that there are jobs existing in significant numbers in the economy which Mr. Corder can perform consistent with his age, education, work experience, and functional limitations (R. 19, 20-21). The ALJ found that (1) Mr. Corder is 40 years old, which is classified as a younger individual; (2) has a limited education; and (3) has no transferable skills (R. 19). The ALJ noted, however, that Mr. Corder can perform a limited range of light work, and using the Medical-Vocational Guidelines ("Grid") Rules 202.17 and 202.18 "as a framework for decision making, a conclusion . . . that the claimant retains the capacity to perform jobs existing in significant numbers in the economy" is warranted (R. 20-21). However, the ALJ noted that since Mr. Corder's residual functional capacity limitations "do not exactly coincide with those considered under these rules," the Grid cannot be applied directly to reach a result in this case (R. 19). Therefore, the effect of Mr. Corder's additional non-exertional limitations on his exertional RFC was considered (R. 19).

The ALJ found that Mr. Corder's additional non-exertional limitations were only slight and did not significantly erode the relevant occupational base of "light" work (R. 19). Therefore, using Grid Rules 202.17 and 202.18, the ALJ concluded that there remains a significant number of jobs in the economy which Mr. Corder can perform (R. 19-21).

## II.

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Rather, the Court must accept findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405 (g) (1988), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron* 19 F.3d at 333 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Where conflicting evidence

allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or ALJ), not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Erhart v. Secretary of Health and Human Service*, 969 F.2d 534, 538 (7th Cir. 1992).

Of course, this does not mean that the Commissioner (or ALJ) is entitled to unlimited judicial deference. The ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his or her ultimate conclusion. *Herron*, 19 F.3d at 333. And, although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young v. Secretary of Health and Human Services*, 957 F.2d 386, 393 (7th Cir. 1992) (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, *9 (N.D. Ill. 1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (*citing Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)).

The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (1998). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the

14

regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520 (1998); *see also Young*, 957 F.2d at 389. A finding of disability requires an affirmative answer at either Step 3 or Step 5. A negative answer at any step (other than Step 3) precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* The ALJ's analysis at Step 5 typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform a particular category of work (*i.e.* skilled or unskilled and sedentary, light, medium, heavy or very heavy work), as well as the availability of such work in the national economy.

## III.

In this case, Mr. Corder makes two challenges to the ALJ's finding that he is not disabled. *First,* Mr. Corder argues that the ALJ improperly found at Step 3 that Mr. Corder's mental impairments do not meet or equal Listing 12.05. *Second,* Mr. Corder argues that the ALJ improperly found at Step 5 that Mr. Corder's residual functional capacity ("RFC") permits him to perform a significant number of jobs in the national economy by using the Grid, without calling a vocational expert. For the reasons set forth below, the Court finds that the ALJ's Step 3 determination was proper, but we remand this case for further findings and explanations at Step 5 because the ALJ did not satisfy his minimal articulation requirements with respect to three specific issues: (1) the extent of Mr. Corder's exertional RFC with respect to his sitting, standing and walking abilities -- all of which are necessary to perform even a limited range of "light work;" (2) what the "limited range of light work" that Mr. Corder's exertional and non-exertional RFC encompasses (*i.e.,* unskilled work

that requires sitting and standing, or unskilled work that includes primarily standing and walking or something else); and (3) why Mr. Corder's borderline intellectual functioning, a non-exertional mental impairment, does not "significantly erode the occupational base" of light work jobs contemplated under Grid Rules 202.17 and 202.18.

## A. The Step Three Determination.

Mr. Corder claims that the ALJ erroneously discounted his mental impairment, or his low IQ scores. Mr. Corder argues that his low IQ scores meet or equal Listing 12.05C (Pl.'s Mem. at 14). In support of this argument, the plaintiff points to the opinion of Dr. Gardner, who indicated that Mr. Corder's mental impairment equaled Listing 12.05C (*Id.*). The government argues that the ALJ was correct in determining that the numerous marked limitations identified by Drs. Diamond and Gardner were inconsistent with the record as a whole, and that Mr. Corder's borderline intelligence had "no great impact on either his daily life or his social relationships" (Def.'s Mem. at 14).

To establish disabling mental retardation under Listing 12.05C, a claimant must show that he has (1) "a significantly subaverage general functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22);" and (2) a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. To be found disabled, a claimant must satisfy all criteria of a listing. *Pope v. Shalala,* 998 F.2d 473, 480 (7th Cir. 1993).

Here, Listing 12.05C requires a verbal, performance or full scale IQ score of between 60 and 70 and another physical or mental impairment which causes additional limitations in the ability to

perform basic work activities. Mr. Corder's IQ was tested twice, and on both occasions all of his IQ scores were greater than 70. On December 15, 1993, Dr. Diamond's testing indicated that Mr. Corder had a verbal IQ score of 71, a performance IQ score of 76, and a full scale IQ score of 72 (R. 160). On May 21, 1997, three and a half years later, Dr. Gardner's testing indicated that Mr. Corder had verbal and performance IQ scores of 74, with a full scale IQ score of 73 (R. 250). Since Mr. Corder's IQ scores were consistently greater than the threshold of 70, he does not satisfy the second requirement for a 12.05C listing.[5] Therefore, the ALJ did not err in finding that Mr. Corder's mental impairment fails to meet or equal Listing 12.05C.[6]

## B.    The Step Five Determination.

We start from the legal premise, recently reaffirmed by the Seventh Circuit, that where the ALJ denies benefits, the written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, __ F.3d ____, No. 00-2303, 2001 WL 355642, ** 4, 6 (7th Cir., April 6, 2001). The Court finds that at Step 5, the ALJ failed to satisfy this standard, otherwise known as the "minimal articulation" requirement, in several respects, which we address below.

---

[5] The plaintiff argues that the Commissioner's Program Operations Manual requires an ALJ to consider whether a claimant's impairments equal Listing 12.05C when they have an IQ score between 71 and 75. We reject this argument because it is not supported by any authority and the plaintiff has not attached a copy of the relevant provisions of the Manual. In the absence of such authority, the Court follows the explicit requirements of the regulation (*i.e.*, a verbal, performance or full-scale IQ score between 60-70).

[6] The Court finds unpersuasive the plaintiff's argument that the ALJ impermissibly substituted his opinion for that of Dr. Garner, who opined that Mr. Corder's mental impairments met the 12.05C listing requirement (Pl.'s Mem. at 17). On this point, the ALJ did not substitute his medical judgment for that of Dr. Gardner – he merely applied Listing 12.05C as written. We disagree with the assertion that the ALJ was required to accept Dr. Gardner's conclusion about the applicability of Listing 12.05C over the plain language of the Listing.

1.

At Step 2, the ALJ found that the medical evidence established that Mr. Corder had the following severe, "medically determinable impairments" -- bronchial asthma, degenerative disc disease, arthritis and borderline intellectual functioning (R. 20 (Finding No. 3)). Although these impairments did not, in the ALJ's view, meet or equal a listed disability at Step 3 (*Id.* (Finding No. 4)), the ALJ found at Step 4 that Mr. Corder's impairments did result in limitations to his exertional and non-exertional RFC, namely, that he could not lift more than 20 pounds occasionally or 10 pounds frequently (exertional), he could not kneel, climb, balance or crawl more than occasionally (exertional), and he could not understand, remember and/or carry out detailed and complex work tasks (non-exertional) (*Id.* (Finding No. 6)). The ALJ further found, at Step 4, that Mr. Corder could not perform his past relevant work and that his acquired skills were not transferable (*Id.* (Finding No. 8)).

The ALJ then moved to Step 5, and it is here that the ALJ's decision becomes much too conclusory and fails to meet the minimal articulation requirement. At Step 5, the ALJ found that Mr. Corder had the RFC to perform a limited range of light work. Light work as defined by the regulations involves: (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects. *See* 20 C.F.R. § 404.1567(b); Social Security Ruling 83-10. Thus, according to the regulations, light work requires either the ability to sit *or* the ability to stand and walk: "a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The ALJ, however, did not

even minimally articulate the basis for his finding that Mr. Corder could sit *or* stand and walk for the requisite periods of time.

It is critical for the ALJ to make explicit findings regarding a claimant's ability to sit, stand and walk when a light work finding is made, and to resolve any conflicts in the evidence regarding the claimant's ability to do skilled versus unskilled work. Many unskilled jobs require a person to be standing or walking most of the work day. *See Sanato v. Apfel*, No. 99 C 6236, 2000 WL 1221644, * 14, n. 4 (citing SSR 83-14). Here, there are no findings made by the ALJ with regard to the exertional ability to sit, stand or walk, even though there is some evidence in the record that Mr. Corder cannot stand for long periods of time (R. 208).[7] Consequently, the Court cannot affirm the ALJ's conclusion that Mr. Corder's exertional limitations allow him to perform a "limited range" of "light work."

There is also no explanation whether Mr. Corder's borderline intellectual functioning renders him able only to perform unskilled rather than skilled work. On this point, the ALJ's failure to explain why he found Mr. Corder's past relevant work was skilled is confounding, given the evidence that all of Mr. Corder's past relevant work was unskilled, including his last job collecting money from vending machines (R. 20 (Finding No. 8); 86-91). There is also evidence that Mr. Corder has at best a third to fourth grade reading level (R. 161, 250). By citing to Medical-Vocation

---

[7]Although the ALJ discusses evidence that Mr. Corder has been able to walk the nine blocks to and from his daughter's school each day (R. 17), this one piece of evidence does not constitute substantial evidence to support a finding that Mr. Corder has the exertional RFC to stand or walk for six out of eight hours each day. This is especially true given Mr. Corder's testimonial evidence that he sits most of the day watching television (R. 415). *See also Zurawski*, 2001 WL 355642, at * 4 (noting that ALJ has duty to explain inconsistencies between the "activities of daily living (that were punctured with rest)," complaints of pain, and the medical evidence). There may be substantial evidence to support a finding that Mr. Corder can stand or walk for six to eight hours every day, and therefore perform a significant number of unskilled jobs, but the ALJ has not minimally articulated the basis for such a finding.

Rule 202, the ALJ found that Mr. Corder previously had performed unskilled, semi-skilled and skilled work (Finding No. 11). However, the ALJ offered no explanation of what evidence showed that his prior work had been "skilled or semi-skilled."

Moreover, the ALJ's finding that Mr. Corder's limitations did not "significantly erode the occupational base of jobs contemplated under Medical-Vocational Rules 202.17 and 202.18" (Finding No. 11) suggests that although the ALJ found that Mr. Corder could continue to perform a limited range of light duty work, he also found that this would include unskilled, semi-skilled and skilled work. If Mr. Corder is to perform unskilled work, there is no explanation whether Mr. Corder can stand or walk for six hours a day. And, if he is to perform skilled or semi-skilled work, there is no explanation of how he can perform such tasks, in the face of the ALJ's findings that Mr. Corder has "borderline intellectual functioning" (Finding No. 3) and lacks the ability to perform work that requires "understanding, remembering, and/or carrying out detailed and complex work tasks" (Finding No. 6).

The failure to minimally articulate a rationale reconciling these findings and conclusions leaves the Court without a basis to perform meaningful review. The Court therefore cannot affirm the ALJ's finding at Step 5, and we must remand the case for further explanation and/or evidence on these points.

**2.**

The ALJ also failed to adequately address the evidence concerning the effect of Mr. Corder's non-exertional limits on his ability to work. When non-exertional limitations are present, the ALJ has the burden of establishing by "reliable evidence" that the non-exertional limitations did not significantly limit the range of work permitted by the claimant's exertional limitations. *See Shelman*

*v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In determining whether there is "reliable evidence" the Court must assess whether the ALJ determined "in a responsible manner" whether non-exertional impairments would interfere with the type of jobs the claimant can perform at an exertional level. *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982). Here, the Court finds that the ALJ's reasons for rejecting the medical opinions finding Mr. Corder's non-exertional limitations to be "severe" do not meet this standard.

Although the ALJ referenced the psychiatric evidence from Drs. Diamond and Gardner (Exs. 27; 39), the ALJ rejected their two assessments that Mr. Corder has "poor cognitive ability," because Mr. Corder received these evaluations not as part of treatment he sought for himself but instead "through attorney referral and in connection with an effort to generate evidence for the current appeal" (R. 17). Moreover, according to the ALJ, these examiners "prepared their evaluations at the request of the claimant's attorney" (R. 17), and "[n]one of the other extensive medical evidence refers to the claimant's poor cognitive ability except during the time that he was a heavy drinker" (*Id.*). The ALJ concluded that the "context" in which the Diamond and Gardner assessments were produced made them less persuasive, especially in light of a report noted by the appeals council from the State Disability Determination Services (Ex. 34 at 3), which found Mr. Corder "not disabled" (R. 18).

The Court is mindful that the ALJ is entitled to make credibility determinations, which are ordinarily given great deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). But the ALJ's credibility determination here is primarily premised on the fact that Drs. Gardner and Diamond were asked by Mr. Corder's counsel for an opinion, whereas Drs. Beebe and Vincent are governmental employees. The ALJ offered no explanation of why that difference should be decisive here, except

for his comments suggesting that he perceived bias due to the timing of the examinations and the source of the referral. We do not believe this is a sufficient explanation for disregarding their opinions.

While the bias and interest of any witness is a factor to be considered, in this case the ALJ appeared to rely on that consideration rather than engage in a qualitative analysis of the medical opinions. In so doing, the ALJ failed to resolve any conflicts in the competing opinions, but instead in substance disregarded the opinions of Drs. Gardner and Diamond without analysis, which is improper. *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999) ("an ALJ may not ignore an entire line of evidence that is contrary to her findings").[8]

The failure to explain why the *substance* of Dr. Beebe's and Vincent's opinions is more credible than the substance of Drs. Gardner's and Diamond's opinions is critical. Even in the case of a treating physician, the status of the doctor is not alone dispositive. A treater's opinions are entitled to controlling weight only if they are "well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). Here, none of the four doctors is a treater, which only further heightens the need for a

---

[8] The other comments made by the ALJ do not provide a sufficient basis for disregarding entirely the opinions of Drs. Gardner and Diamond. The ALJ concluded that Drs. Gardner and Diamond's opinions of Mr. Corder's limited intellectual functioning are inconsistent with the fact that Mr. Corder was able to complete the IQ tests (R. 17). But the ability to finish the test is no indication of the ability to do so well. Indeed, under Listing 12.05C, someone who completes an IQ test but scores under 70 and meets other criteria is automatically deemed disabled as retarded. A score that barely exceeds 70 surely does not foreclose the possibility of a severe impairment.

The ALJ also cited his observations of Mr. Corder's demeanor while testifying, and concluded that he saw no signs of limitations "as grave as those intimated by the attorney's appointed evaluators" (R. 18). While an ALJ's credibility determinations will not be reversed unless "patently wrong," *Powers*, 207 F.3d at 435, the ALJ must explain how a claimant's testimony or demeanor during the hearing contradicts the claim. *Zurawski*, 2001 WL 355642, at *4. The ALJ here failed to provide such an explanation. And an explanation here was critical, since it is not obvious how Mr. Corder's "demeanor" would show he does not suffer from extremely limited reading and math skills, a borderline range of intelligence, lack of concentration and memory problems.

critical analysis of their opinions and a reasoned resolution of any conflicts. It is the ALJ's job to reconcile inconsistencies in the record when reaching conclusions, *see, e.g., Zurawski*, 2001 WL 355642, at ** 4-5, which the ALJ will have the opportunity to do on remand.[9]

### 3.

Mr. Corder argues that the ALJ's Step 5 determination also was improper because the ALJ relied exclusively upon the Grid, without calling a vocational expert, even though the medical evidence in the record supports the conclusion that Mr. Corder has severe non-exertional limitations with respect to his mental capabilities (Pl.'s Mem. at 21; Reply at 9-12). In response, the Government argues that the ALJ did not rely exclusively on the Grid, but instead relied on the medical evidence of state agency physicians and on his own credibility determinations (Def.'s Mem. at 15-16, 18-19).

The ALJ did not, in fact, direct a finding under the Grid, but instead acknowledged the presence of non-exertional limitations and the effect those limitations had on a finding under the Grid (R. 19) ("because the claimant's [RFC] limitations do not exactly coincide with those considered under [the Grid], the rules cannot be applied directly to reach a result in this case"). But the ALJ concluded that Mr. Corder's limitations, including his borderline IQ, did not significantly erode the occupational base of light work that he could perform (R. 20 (Finding No. 11)). We find the ALJ's analysis insufficient.

---

[9]It appears that the ALJ may have considered Drs. Beebe and Vincent to be "treaters," and thus given them more credence than Drs. Gardner and Diamond (R. 18) (noting that the fact that Drs. Gardner and Diamond were retained experts "cannot be entirely ignored especially when considered in the light of other evidence from treating sources"). However, while there was evidence from treaters focusing on Mr. Corder's physical limitations, *none* of the mental health professionals who saw Mr. Corder was a treating physician including Drs. Beebe and Vincent, who each saw Mr. Corder once in 1993 as part of the proceedings on the disability claim. Thus, to the extent that the ALJ considered Drs. Beebe and Vincent to be "treaters," that was clearly erroneous.

The ALJ's decision also fails to give adequate explanation of the conclusions concerning the number of jobs Mr. Corder can perform within the "limited" light work range. Once the ALJ found that Mr. Corder could not perform his past relevant work at Step 4, the burden of proof switched to the Commissioner to prove that a substantial number of jobs existed in the national economy that Mr. Corder could perform with his exertional residual functional capacity, in spite of his non-exertional limitations. *See, e.g., Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986); *see also Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994).

The ALJ specifically found that Mr. Corder had a residual mental capacity to perform simple work, but he could not understand, remember or carry out detailed and complex work tasks (R. 20). There is no other finding or explanation, however, that links Mr. Corder's limited ability to perform simple tasks with the ALJ's finding that Mr. Corder has the RFC to perform skilled or semi-skilled light work. If Mr. Corder is limited to simple tasks, he may only be able to perform unskilled work. Unskilled work, in substantial numbers, may require an exertional ability to stand and walk that Mr. Corder does not possess. Although the opposite may be true, there is no articulation by the ALJ to aid the Court on this point. *See Sanato*, 2000 WL 1221644, at * 14, n.4 (citing SSR 83-14). Moreover, if Mr. Corder is only able to sit for long periods in the day, there is no articulation of how many unskilled jobs there may be with this exertional limitation. In other words, the ALJ has failed to link up Mr. Corder's exertional ability to sit *or* stand and walk, with the intellectual ability to perform simple, unskilled tasks and/or skilled and semi-skilled work.

The outcome of that analysis determines the need for further evidence concerning the range of available work that Mr. Corder can perform. In general, when the Grid applies, the ALJ need not submit the testimony of a vocational expert to prove the existence of jobs which the claimant is

capable of performing, since a major purpose of the Grid is to obviate the need for such testimony. *See Kirk v. Secretary,* 667 F.2d 524, 529 (6th Cir. 1981). However, if the ALJ finds on remand that Mr. Corder suffered from severe non-exertional limitations, he will be foreclosed from placing exclusive reliance on the Grid. *Nelson,* 770 F.2d at 684. The Seventh Circuit has noted that when the Grid cannot be exclusively used, vocational expert testimony may be helpful, but it is not always required; rather the Commissioner may use any "reliable evidence" that would "persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available." *Warmoth v. Bowen,* 798 F.2d 1109, 1110 (7th Cir. 1986). *Accord Nelson,* 770 F.2d at 684-85; *Walker v. Bowen,* 834 F.2d 635, 641 (7th Cir. 1987). But "if non-exertional limitations *might* substantially reduce the range of work an individual can perform, the use of Grids would be inappropriate and the ALJ must consult a vocational expert." *Zurawski,* 2001 WL 355642, at * 7 (emphasis added) (citing *Luna v. Shalala,* 22 F.3d 687, 691 (7th Cir. 1994)). *Compare Lucy v. Chater,* 113 F.3d 905, 908 (8th Cir. 1997) ("borderline intellectual functioning is a significant nonexertional impairment that *must* be considered by a vocational expert"), *Foreman v. Callahan,* 122 F.3d 24, 26 (8th Cir. 1997) (same). We leave it to the parties and the ALJ on remand to decide in the first instance whether vocational expert testimony will be helpful or necessary.[10]

---

[10]Other courts have concluded that borderline intellectual functioning is a significant non-exertional impairment that must be considered by a vocational expert. *See, e.g., Sanders v. Sullivan,* 983 F.2d 822, 824 (8th Cir. 1992) (the ALJ's unsupported assertion that plaintiff's mental impairment would not limit his ability to perform the full range of jobs contemplated in the Grids invaded the province of the vocational expert). Although we do not go this far, we note that the Commissioner will have to determine whether to offer (and the ALJ will have to decide whether to receive) vocational expert testimony based on the evidentiary burdens they must carry in this case.

## CONCLUSION

After review of the record and the Commissioner's decision, the Court finds that the Commissioner's decision must be reversed and remanded, pursuant to Sentence 4, 42 U.S.C. § 405(g), for further proceedings to make a Step 5 finding regarding the extent of Mr. Corder's exertional and non-exertional impairments, how those impairments impact his ability to perform a "limited" range of light work, and what work is available given the limitations that are found. For these reasons, the Court grants the plaintiff's motion for summary judgment (doc. # 13-1) remanding the case for further proceedings consistent with this opinion, and denies the government's cross-motion (doc. # 11-1). The Clerk of the Court is therefore directed to enter a final judgment pursuant to 42 U.S.C. § 405(g) (Sentence 4) and Fed. R. Civ. P. 58 and to terminate this case.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

Dated: May 3, 2001